IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-1940
(Summary Calendar)
_____

MACK ARTHUR KING

Petitioner-Appellant,

versus

S.W. PUCKETT, Superintendent,
Mississippi State Penitentiary,
and MIKE MOORE, Attorney General,
State of Mississippi,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Mississippi

_____

(August 25, 1993)

BEFORE JONES, DUHÉ, and WIENER, Circuit Judges.

WIENER, Circuit Judge.

In this petition for a writ of habeas corpus, Petitioner-Appellant Mack Arthur King appeals the district court's denial of his petition, challenging, inter alia, the constitutionality of the jury instruction, which informed the jurySQwithout limiting instructionSQthat the "especially heinous, atrocious or cruel" nature of the murder was an aggravating factor for consideration in determining whether the death penalty should be imposed. Based on subsequent jurisprudential developments which clearly state that such an unlimited instruction is unconstitutional and may be challenged notwithstanding a defendant's failure to object at trial

or on direct appeal, we remand to the district court with directions to issue the writ of habeas corpus within a reasonable time unless the state initiates appropriate proceedings.

I

FACTS AND PROCEEDINGS

In the morning of August 3rd, 1980, Mrs. Lelia Patterson, an 84 year old widow, was discovered dead in her bathtub. An autopsy revealed that Mrs. Patterson had been struck on the head, strangled, and drowned. The pathologist could not determine the precise sequence of these events, and he testified that death could be attributed either to the blow, the strangulation, or the drowning. Finger and palm prints found on file folders located in the house led the police to suspect King.

A search of King's residence uncovered articles belonging to Mrs. Patterson. In a subsequent search, the police discovered blood-spattered pants, which, according to King's girlfriend, King was wearing on August 2nd and 3rd and which he washed himself, refusing to let his girlfriend wash them as was customary. Testing disclosed that the blood on the pants was human, although the blood type was indeterminable.

In his first statement to the police, King denied that he had been at the house on the day of the murder. After police confronted him with the stolen items, he admitted that he had burglarized the home on August 2nd. He denied, however, any involvement in the murder. Rather, he stated that he was accompanied by Willie Porter, his uncle, who remained outside while

2

King burglarized the home. King claimed that, as he was leaving, he saw Porter, who had been drinking, enter Mrs. Patterson's home.

King was charged with capital murder, and Joe O. Sams, Jr., who had represented King in an earlier burglary charge, was appointed to represent him. Sams was assisted by a recent law school graduate Thomas L. Kesler and a legal intern, Tammy Lynn Woolbright. Kesler interviewed King on two occasions prior to trial. He determined that King was "slow" and "dull-witted." Based on this determination, as well as Sam's prior experience with King, Sam filed a motion with the trial court seeking a mental examination for King. The court granted the motion, committing King for a mental examination to determine: (1) his level of intelligence; (2) his ability to comprehend the gravity of the charges; (3) his ability to assist in his defense; (4) the standard of conduct that King would likely exhibit during trial; and (5) his competency to stand trial.

The state hospital examined King and the staff announced in a one paragraph report "that the patient was without psychosis, competent to stand trial and responsible for his actions at the time of the alleged crime." No finding on the other points was made, and none was requested either by King's attorneys or the court.

Despite King's protestations of innocence, he was convicted of capital murder. During the trial, his attorneys did not present any witnesses, relying solely on the cross-examination of the state's witnesses. King did not testify. On appeal, his attorneys

3

emphasize that King, "then a 21-year old black man, was tried for the murder of a white woman before an all-white jury, a white judge, and a white prosecutor."

After King's conviction, the court instructed the jury to weigh the aggravating factors against the mitigating factors presented in determining whether the death penalty should be imposed. The jury considered two aggravating factors: that the murder was committed in the course of a felony and that the murder was committed in an "especially heinous, atrocious or cruel manner." No mitigating factors were presented. Within a short period, the jury returned a sentence of death.

King's conviction and sentence were affirmed by the Mississippi Supreme Court.[1] Likewise, his motion for post-conviction relief, then known as a petition for writ of error coram nobis, was denied without prejudice.[2] The supreme court ruled that certain of his claims were procedurally barred because they had not been raised on direct appeal. Included among these claims was a constitutional challenge to the "especially heinous, atrocious or cruel" aggravating factor.

King was allowed, however, to refile his request regarding his claim of ineffective assistance of counsel. Acting on this second petition, the supreme court ordered an evidentiary hearing for the ineffective assistance of counsel claim. Attorney Sams explained

---

[1] King v. State, 421 So. 2d 1009 (Miss. 1982), cert. denied, 461 U.S. 919 (1983).

[2] King v. Thigpen, 441 So. 2d 1365 (Miss. 1983).

4

that his decisions not to present character witnesses and not to follow up on evidence of King's diminished mental capacity were tactical.  The state circuit court conducted the hearing and concluded that "counsel's representation during the sentencing phase of the trial was competent."

King next sought relief in federal district court on a petition for a writ of habeas corpus.  The district court reviewed the ineffective assistance of counsel claim, concluding that the alleged deficiencies were tactical decisions.  Important for this appeal, however, the district court determined, as did the Mississippi Supreme Court, that most of King's claims were procedurally barred because he had not raised them at trial or on appeal.

II

ANALYSIS

A. Constitutional Challenge

Our review of King's constitutional challenge is guided by this court's recent decisions in Wiley v. Puckett[3] and Smith v. Black.[4]  In Wiley, we recognized the unconstitutionality of the "especially heinous, atrocious or cruel" aggravating circumstances when given without a limiting instruction,[5] and addressed the issue whether the state court had cured the constitutional infirmity.

---

[3] 969 F.2d 86 (5th Cir. 1992).

[4] 970 F.2d 1383 (5th Cir. 1992).

[5] See Maynard v. Cartwright, 486 U.S. 356 (1988).

5

Again based on Supreme Court precedent,[6] we set forth the manner in which "an appellate court could salvage a death sentence."[7]  The appellate court could (1) "reweigh" the mitigating and aggravating factors or (2) conduct a harmless error analysis by asking whether, beyond a reasonable doubt, the death sentence would have been imposed had the aggravating factor been properly defined in the jury instruction.  In Wiley, however, we concluded that the state supreme court, by applying a narrowing construction to the "especially heinous" circumstance, had failed to do either.

Subsequently ,in Smith, we addressed the question whether Mississippi could raise a procedural bar to a constitutional challenge to the "especially heinous" instruction based on the petitioners failure to object at trial and to preserve the issue on appeal.  We ruled that Mississippi could not rely on either the contemporaneous objection bar or the direct appeal bar as neither had been applied to cases consistently.  Consequently, we relied on the venerable maxim that "[a] state procedural rule will not function as an adequate and independent state ground supporting the judgment if it is not `strictly or regularly followed.'"[8]

The application of Wiley and Smith to the instant case dictates a remand to the district court with directions to issue the writ of habeas corpus unless the State of Mississippi initiates

---

[6] See Clemons v. Mississippi, 494 U.S. 738 (1990).

[7] Wiley, 969 F.2d at 91.

[8] Smith,970 F.2d at 1386 (Quoting Hathorn v. Lovorn, 457 U.S. 255, 262-63 (1982)(citation omitted)).

appropriate proceedings in a state court within a reasonable time after the issuance of our mandate. The "especially heinous" aggravating circumstance instruction is unconstitutionally broad when given without a limiting instruction, as was the case here. Moreover, the state court cannot bar King's claim by virtue of his failure to object at trial or raise the issue on appeal. As the supreme court applied such a bar, it is clear that it neither reweighed the aggravating and mitigating factors nor conducted a harmless error analysis. Consequently, it has not cured the constitutional infirmity of the "especially heinous" instruction.

Given the state's options, it is conceivable that King will not receive a new sentencing procedure; therefore, the errors he alleges in that proceeding would continue to affect his sentence. Consequently, we review the remaining issues raised by King, some of which the district court considered despite the procedural bar. A review of the briefs and records convinces us that we can add little to the thorough and well-reasoned opinion of the district court. Accordingly, we deal only briefly with each issue.

B. <u>Ineffective Assistance of Counsel</u>

King raises two related ineffective assistance issues: (1) he received ineffective assistance of counsel because his trial counsel failed to investigate and present readily available mitigating evidence of character and low intelligence at the sentencing phase; and (2) whether the federal district court should have conducted an evidentiary hearing when considering King's ineffective assistance claim based on the state court's failure to

7

make specific factual and credibility determinations. We address each in turn.

1. <u>Mitigating Evidence</u>

As the district court notes, failure to proffer mitigating evidence at the sentencing phase is not per se ineffective assistance of counsel, and we have "often upheld decisions not to put on mitigating evidence wh[en] the decision resulted from a strategic choice."[9]  Under <u>Strickland v. Washington</u>,[10] the important inquiry is whether the decision not to offer the evidence was reasonable in all the circumstances, and, if an error was committed, that it affected the outcome of the trial.[11]

We agree with the district court that the superficial investigation and decision not to offer witnesses was reasonable under the circumstances. Sams, who had represented King in a prior burglary charge, knew from previous investigation that King's reputation in the community was exceedingly poor. Moreover, Sams knew that Porter, the man King accused of the crime, was also his uncle. He assumed, reasonably, that this would cause tension within the family. Even if family members had been presented to testify that King had never been violent before and that Porter was a bad influence, this testimony would have opened the door to rebuttal testimony regarding King's poor reputation.

We are more troubled, however, by Sams failure to follow up on

---

[9] <u>Stringer v. Jackson</u>, 862 F.2d 1108, 1116 (5th Cir. 1988).

[10] 466 U.S. 668 (1984).

[11] <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

8

his own motion seeking an evaluation of King's mental capacity. Indeed, Sams himself doubted King's intellectual capacity, yet when the state hospital failed to provide the information, expressly directed by the court's order, Sams did nothing. According to King, the evidence of his diminished mental capacity caused him to have difficulty in controlling his instinctive responses, to misperceive events, and to react in relatively unpredictable ways. This, he insists, is mitigating evidence.

At the coram nobis hearing, Sams justified his failure to seek additional information regarding King's intellectual capacity on two grounds: (1) he did not think that King was significantly impaired; and (2) historically jurors in the county did not excuse a person because of diminished mental capacity. But, Sams' own request for the evaluation belies these statements. If, as Sams testified, King's lack of intelligence would have no effect on his trial, why did Sams request the evaluation?

Notwithstanding the apparent contradiction between Sam's request for a mental evaluation and his failure to follow up on it, we need not decide whether this omission was professionally unreasonable under Strickland, for in any event counsel's ineffective assistance must also affect the outcome of the trial or sentencing. In the instant case, we cannot conclude that the failure to offer mitigating evidence in the form of King's diminished mental capacity affected the outcome of his sentencing. Even with such mitigating factors, the jury had two aggravating factors weighing in favor of the death penalty. Although we now

9

know that, absent a limiting instruction, the "especially heinous" aggravating circumstance instruction is unconstitutionally overbroad, the question under Strickland's prejudice prong is whether the ineffective actions of counsel affected the outcome of the trial. The answer here is no.

Yet, if we were to eliminate the "especially heinous" circumstance and reweigh the factors, as the Mississippi supreme court may choose to doSQand as would (or could) be done in a new sentencing trialSQ, then King would have a more compelling argument that his counsel's failure to present mitigating evidence at the sentencing phase affected the outcome of his sentence. Although Mississippi is not constitutionally required to conduct a new sentencing hearing,[12] we suggest that the option of holding such a hearing be given serious consideration on remand. in the instant case.

2. Evidentiary Hearing

King also claims that the district court erred in failing to hold an evidentiary hearing on his claim of ineffective assistance, as the state court failed in its coram nobis proceeding to make any relevant factual determinations. This claim is without merit. It is well established that no hearing is required when the habeas petitioner fails to allege the type of prejudice necessary to satisfy that prong of Strickland.[13] Moreover, we will not remand a case for an evidentiary hearing when the district court, as it

---

[12] Wiley, 969 F.2d at 94.

[13] Hill v. Lockhart, 474 U.S. 52 (1985).

10

did here, has made a full review and search of the complete record and no additional evidentiary development is necessary on an issue.[14]

C. Jury Instruction

In addition to his successful claim regarding the unconstitutionality of the "especially heinous" instruction, King argues that the court erred in refusing to instruct the jury that, even if the aggravating factors outweighed the mitigating factors, the jury could impose a life sentence. Although King concedes, as he must, that such an instruction is not required and failure to give the instruction is not reversible error,[15] he nonetheless challenges the instruction on equal protection grounds. His argument on this point is vague, stating simply that "[o]ther capital defendants convicted in Mississippi have been afforded the benefit of the `life option' instruction or its equivalent. . . . King was not."

King, however, misapprehends the decisions of the Mississippi supreme court, which has consistently stated that no such instruction is required. Thus, refusal to grant such an instruction is not reversible error. Moreover, the court views the granting of a "life option" instruction as harmless error because it favors the defendant.[16] Consequently, King is not entitled to

---

[14] Williams v. Blackburn, 649 F.2d 1019 (5th Cir. 1981).

[15] Wiley v. State, 484 So. 2d 339 (Miss.), cert denied, 479 U.S. 906 (1986).

[16] Hansen v. State, 592 So. 2d 114, 150 (Miss. 1991).

such an instruction (which he did not request), and the court's failure to inform the jury of the "life option" was neither reversible error nor an equal protection violation.

D. Prosecutorial Misconduct

King insists that the prosecutor's closing argument during the sentencing phase was replete with improper and inflammatory remarks.   He cites the following four statements:

1. And I deal with criminal cases every week, ladies and gentlemen, and I might submit to you that I don't ask for the death penalty in every case because they may not warrant it, but this case I'm asking for the death penalty because it was senseless.

2. Can you imagine what Mrs. Patterson was thinking when that man had her around the neck and she was screaming, "help," and I'm talking for Mrs. Patterson now, and I am asking you to help Mrs. Patterson, and I will ask you ladies and gentlemen to write down as the second aggravating circumstances . . . "the crime was committed in an especially heinous, cruel and atrocious manner.

3. The second reason [for imposing the death sentence], I don't know if it is not more important than the first. It's a deterrent to others to commit the same kind of crime.  It will tell you, ladies and gentlemen, and you're going to speak out to all the potential murderers and other citizens and other criminals in this country. [T]he death penalty is a deterrent to other people, and it will tell those people that if you commit the crime that you could be subjected to the death penalty. . . . So we got two things here, . . . and I want this country to know that we're not going to tolerate.

4. [T]he black minister, you remember I asked him, "you're a minister, do you have any religious beliefs against the death penalty?"  And he said, "can I explain it?"  He says, "I looked in the book and it says, `he who kills shall be killed.'"

King argues, that taken together, these improper comments were "calculated to incite an unreasonable and retaliatory sentencing decision, rather than a decision based on a reasoned moral response

to the evidence"[17] and denied King a fundamentally fair sentencing proceeding.

We again agree with the district court's conclusion that these statements, viewed as a whole, did not render the sentencing fundamentally unfair. Rather, the statements were not persistent nor pronounced and do not reach the level of error required for reversal. Moreover, the jury had been informed that it was the sole judge of the facts and that arguments, statements, and remarks of counsel having no basis in the evidence should be disregarded.

E. Inadequate Appellate Review

King argues that the Mississippi supreme court was unable to review his appeal meaningfully due to the absence of a complete transcript and a complete report from the trial court, as required by law. We adopt the district court's discussion on this point and conclude that no error of constitutional magnitude occurred.

F. Racial Discrimination

Finally, King raises a claim that the Mississippi death penalty is applied in a racially discriminatory manner. In an effort to support his claim, King presents statistical evidence discussing the increased likelihood that a black male accused of killing a white victim will receive the death penalty. He also emphasizes the prosecutor's remarks about the "black minister" during closing arguments (which King claims is a thinly veiled racial remark) and the prosecutors use of peremptory challenges to

---

[17] Lesko v. Lehman, 925 F.2d 1527 (3d Cir.) cert. denied, 112 S.Ct 273 (1991).

remove black jurors from the venire.

The district court held that this evidence insufficient to establish racial discrimination in sentencing.  First, the court noted that in McCleskey v. Kemp[18] the Supreme Court had held statistical evidence like King's insufficient.  Second, the court ruled that King's other evidence was "an opportunity to repeat other grounds raised in the petition."  King argues that the evidence concerning prosecutorial conduct during his sentencing proceeding is sufficient under McCleskey to prove that the decisionmakers in his case acted with discriminatory purpose.  We disagree.

First, we cannot agree that the prosecutor's reference to the "black minister" on venire is a racial remark.  If anything, it is an attempted religious endorsement of the death penalty.  Second, King's allegations concerning the jury makeup are vague and inconclusive.  Based on the record before it, the district court found that there was no practice of excluding black jurors under the standard of Swain v. Alabama, the case applicable at the time of King's sentencing.[19]  The district court found, and we agree, that King's allegations fall far short of demonstrating racial discrimination in the Mississippi sentencing scheme.

### III

### CONCLUSION

In his petition for habeas corpus, King alleges several errors

---

[18]  481 U.S. 279 (1987).

[19]  380 U.S. 202 (1965).

14

in his sentencing proceeding. Although we conclude that most of his allegations are without merit, we hold that the "especially heinous" aggravating factor, given without limiting instructions, was unconstitutional. Consequently, we remand to the district court to issue the habeas writ unless the state initiates the appropriate proceedings. While acknowledging that we are without authority to order a new sentencing hearing, we recommend that the holding of such a proceeding be given serious consideration in this case, given the failure of King's counsel to pursue potentially mitigating evidence. All other claims raised by King, however, are without merit.

REVERSED and REMANDED.